| | |
|---|---|
| KARLA LYNCH, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> JEWELERS MUTUAL INSURANCE COMPANY, SI; and JM SPECIALTY INSURANCE COMPANY, <br><br> Defendants. | Case No. 1:26-cv-00597 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Karla Lynch ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendants Jewelers Mutual Insurance Company, SI, and JM Specialty Insurance Company (collectively, "Jewelers Mutual Group" or "Defendants"), and in support thereof alleges the following:

## I.     NATURE OF THE ACTION

1.      This is a class action brought against Defendants for the wiretapping of electronic communications of visitors to Defendants' Website, https://www.jewelersmutual.com ("Website"), and all of the Website's subpages.

2.      Defendants procure at least two third-party vendors ("Code Vendors") to embed snippets of JavaScript computer code (the "Code") on the Website, which then deploys on each Website visitor's internet browser for the purpose of intercepting and recording the Website visitor's electronic communications with the Website. The Code intercepts Website visitors' page views, URLs of web pages visited, browser information, IP address, demographic information,

form submissions, and/or other electronic communications in real-time (collectively, "Website Communications").

3. The Code Vendors include Mixpanel and New Relic, both web analytics platforms whose Code enables tracking of Website Communications in real time.

4. The Code procured by Defendants surreptitiously and instantaneously intercepted, stored, and recorded everything Plaintiff and the Class Members did on the Website, *e.g.*, what they searched for, what they looked at, the information they input, and what they clicked on for the entire duration of their visit.

5. The Code Vendors create and deploy the Code at Defendants' request, which captures and stores the Website Communications of each Website visitor.

6. Even worse, though Defendants sought consent from Website visitors through the use of a cookie pop-up banner, they continued to wiretap visitors who expressly declined consent. Indeed, even after Plaintiff and Class Members declined all available cookie tracking options, Defendants allowed the Code to continue to collect their Website Communications.

7. Defendants knowingly, willfully, and intentionally procured the interception of, and used, the electronic communications at issue without the knowledge or prior consent (or, in some cases, against their direct rejection of consent) of Plaintiff or the Class Members. Defendants did so for their own financial gain and in violation of Plaintiff's and the Class Members' substantive legal privacy rights under state wiretapping laws and common law.

8. Plaintiff brings this action individually and on behalf of a class of all Pennsylvania citizens whose Website Communications were intercepted through the use of the Code embedded on Defendants' Website. Plaintiff seeks all civil remedies provided under the causes of action,

2

including but not limited to compensatory, statutory, and/or punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

## II.    PARTIES

9.    Plaintiff Karla Lynch is, and was at all relevant times, a resident and citizen of the Commonwealth of Pennsylvania.

10.    Defendant Jewelers Mutual Insurance Company, SI, is a corporation organized under the laws of Wisconsin, with its principal place of business at 24 Jewelers Park Drive, Neenah, Wisconsin 54956. Defendant is a citizen of Wisconsin.

11.    Defendant JM Specialty Insurance Company is a corporation organized under the laws of Wisconsin, with its principal place of business at 24 Jewelers Park Drive, Neenah, Wisconsin 54956. Defendant is a citizen of Wisconsin.

12.    Defendants, acting collectively under the name "Jewelers Mutual Group," own, manage, and operate the Website at www.jewelersmutual.com, including its subpages.

## III.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendants.

14.    This Court has general personal jurisdiction over Defendants because Defendants maintain their primary place of business in Winnebago County, Wisconsin and thus have continuous and systematic affiliations that render them at home in this State.

3

15. Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District.

## IV. FACTUAL ALLEGATIONS

### A. How the Code Intercepts Website Communications

16. Mixpanel is an analytics platform for mobile devices and websites. Through their analytics and engagement product, companies can analyze how and why their users engage with website content, and "convert," *i.e.* make e-commerce purchases. This analysis happens in real time across websites and mobile devices.

17. Mixpanel thus promises to its customers, like Defendants, that its platform will "help[ ] improve product and web experiences by understanding user behavior, spotting patterns, and making informed decisions."[1]

18. Mixpanel collects this highly detailed information about web users through the use of a tracking tag called the Mixpanel Pixel.

19. Defendants installed Mixpanel on the Website:



*Screenshot demonstrating that the Mixpanel Pixel is installed on Defendants' Website after rejecting cookies.*

---

[1] Mixpanel, https://mixpanel.com/home/ (accessed Apr. 8, 2026).

20. When a user arrives at Defendants' Website, the user's browser—unbeknownst to the user—sends a request to load the Mixpanel Pixel. Mixpanel's server then places a tracking cookie on the user's browser, assigns the user session a unique ID, and begins the process of "mapping," *i.e.*, identifying the Website user by gathering information such as cookies, IP addresses, email addresses, device and operating system information, location information, and other unique identifiers.



*Website code demonstrating data collected in real time by Mixpanel after rejecting cookies, including the fact that the Website visitor is seeking to insure a "Necklace".*

21. Mixpanel also intercepts information that Website users are attempting to communicate to Defendants, such as where the user clicks, scrolls, or navigates; what text the user inputs (whether or not the user actually submits the information); and even where the user is focusing while on a given subpage of the Website.

22. Mixpanel receives the Website user's actions contemporaneously with those actions. This means that as soon as the Website loads, the already installed Mixpanel Pixel fires, and any action the Website user takes is sent not only to Defendants but also to Mixpanel.

23. Plaintiff did not consent to the interception of her data by Mixpanel. Mixpanel's nonconsensual interception of Plaintiff's data resulted from Defendants' conduct, constitutes an invasion of privacy and violates Pennsylvania law.

24. New Relic code is produced by New Relic, Inc., a technology company that promises website operators like Defendants that its "Intelligent Observability Platform . . . harnesses the power of AI [artificial intelligence] for business growth."[2]

25. New Relic code is a type of Session Replay Code; *i.e.*, a code that captures and stores sufficient data about a user's visit to a website to enable the user's entire browsing session to be replayed after the fact.

26. New Relic's documentation to website operators, like Defendants, explains how Session Replay Code works:

> When [a] user loads your web page, session replay takes a snapshot of the Document Object Model (DOM), which represents the page's structure and visual elements. To ensure accurate styling information, the browser agent accesses your CSS files. The agent then integrates these styles directly into the replay recording, eliminating the need to reference external CSS files during playback. As the user interacts with the page, a library within the browser agent captures any changes made to the DOM. This captured data is then stored securely in New Relic's database. Replays store up to: 4 hours of a user session [and] 30 minutes of inactivity."[3]

---

[2] *Platform*, New Relic, https://newrelic.com/platform (last accessed Apr. 8, 2026).
[3] *Session replay*, New Relic, https://docs.newrelic.com/docs/browser/browser-monitoring/browser-pro-features/session-replay/get-started/ (visited Apr. 8, 2026).

6

27. Defendants have installed New Relic code on the Website:



*Screenshot demonstrating that New Relic's code is installed on Defendants' Website.[4]*

28. New Relic collects information relating to every aspect of a website user's interactions on Defendants' Website: where the user clicks, scrolls, or navigates; what text the user inputs (whether or not the user actually submits the information); and even where the user is focusing while on a given subpage of the Website.[5]

---

[4] *See, e.g.*, *Relic Solution: What is bam.nr-data.net? New Relic Browser monitoring*, New Relic Support (Sep. 14, 2022), https://support.newrelic.com/s/hubtopic/aAX8W0000008YtrWAE/relic-solution-what-is-bamnrdatanet-new-relic-browser-monitoring ("Here's the short explanation: The Browser application monitoring agent transmits data to New Relic's data collection servers via the domain bam.nr-data.net.")
[5] *Session replay*, *supra* n. 3.



*Website code demonstrating data collected in real time by New Relic after rejecting cookies, including the $20,000 value the Website visitor places on their jewelry for insurance purposes.*

29.     As New Relic promises, this tracking begins the moment a user arrives on Defendants' Website.

30.     New Relic receives the information about a website user's actions contemporaneously with those actions. In fact, "[o]ne of the primary benefits of browser monitoring," such as the Session Replay Code offered by New Relic, "is that it provides real-time data on user behavior."[6]

31.     Once New Relic has recorded the events from a user's session, website operators like Defendants can view a reenactment of the user's visit, meaning that "[u]nlike typical analytics

---

[6] Asha Ranu, *Unlocking the Power of Browser Monitoring with New Relic*, Medium (May 8, 2023), https://medium.com/@rana.ash1997/unlocking-the-power-of-browser-monitoring-with-new-relic-dee5d21abaf8.

8

services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[7]

32. Because Session Replay Codes like New Relic, by default, indiscriminately capture the maximum range of user-initiated events and content displayed on a website, researchers have found that a variety of highly-sensitive information can be captured in event responses from website visitors, including information that the user did not actually transmit to the website.

33. Plaintiff did not consent to the interception of her data by New Relic. New Relic's nonconsensual interception of Plaintiff's data resulted from Defendants' conduct, constitutes an invasion of privacy and violates Pennsylvania law.

**B.** **Website Users Have a Reasonable Expectation of Privacy in their Interactions with Defendants' Website**

34. Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."

35. Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website hosts and not be shared with a third-party they know nothing about. As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.

36. Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

---

[7] Steven Englehardt, *No boundaries: Exfiltration of personal data by session replay scripts*, CITP Blog (Nov. 15, 2017), https://blog.citp.princeton.edu/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts.

9

37. A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.

38. Moreover, according to a study by Pew Research Center, a significant majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

39. Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.

40. Defendants' Website purports to provide users with the opportunity to decline the third-party tracking described. When a Website visitor visits the Website, Defendants display a banner telling users that the site uses cookies to "enhance visitor experience, analyze performance, & for marketing purposes. By clicking 'Accept & Continue' you agree to these uses & sharing of information with third parties."



*Cookie notification banner on Defendants' Website.*

41. Instead of clicking "Accept & Continue," users can also elect to "Manage Choices." When users click "Manage Choices," they are presented with the purported opportunity to consent to the use of Functional Cookies and Advertising Cookies:



*Menu purporting to allow users to withhold consent for Functional and/or Advertising cookies.*

42. This menu includes a list of "Required Cookies" that cannot be turned off on the Website. A user who expands the section of "Required Cookies" will see a list of third-party providers whose cookies are always active on the site:



*List of "Required Cookies" to use Defendants' website.*

43.    Mixpanel and New Relic are not listed as "Required Cookies" on Defendants' website.

44.    Reasonable Website users understand Defendants' cookie notification pop-up to mean that by withholding consent for Functional and Marketing Cookies, users will prevent any third-party that is not on the "Required Cookies" list from tracking their Website Communications.

45.     Users of Defendants' Website who disable certain categories of cookie tracking do so with the clear and objectively reasonable expectation that their data will not be collected, disclosed, used, or analyzed in any way—let alone by unknown third parties.

46.     However, Defendants do not respect their Website users' choices to opt out of the use and disclosure of their data. Instead, Defendants enable Mixpanel and New Relic to continue to collect, use, and analyze Website Communications even when users do not consent to such collection, use, and analysis.

**C.      Website User and Usage Data Have Immense Economic Value**

47.     The "world's most valuable resource is no longer oil, but data."[8]

48.     In 2022, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[9] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[10]

49.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success.

---

[8] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), at https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[9] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[10] *Id*.

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[11]

50. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[12] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[13]

51. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [*i.e.,* $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military are estimated to cost USD 55."[14]

### D. **Plaintiff's and Class Members' Experiences**

52. While in Pennsylvania, Plaintiff visited www.jewelersmutual.com and certain of its subpages.

53. Plaintiff chose to disable functional and advertising cookies when Defendants presented her with the option to do so.

54. Following Plaintiff's visit to the Website, she began receiving targeted advertisements for Jewelers Mutual and similar products on her social media accounts. Upon

---

[11] Brad Brown, *et al*, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.
[12] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGIT. ECON. PAPERS, No. 220 (Apr. 2, 2013), https://www.oecd.org/content/dam/oecd/en/publications/reports/2013/04/exploring-the-economics-of-personal-data_g17a228d/5k486qtxldmq-en.pdf.
[13] *Id.* at 25.
[14] *Id.*

information and belief, these advertisements were a result of the Code Vendors capturing her information during her Website visit.

55. The wiretapping by the Code is ongoing during the visit and intercepts the contents of these communications between Plaintiff and Defendants with instantaneous transmissions to Mixpanel and New Relic.

56. Thus, on multiple occasions when Plaintiff visited Defendants' Website, the contents of her communications with the Website were intercepted by the Code, and simultaneously transmitted to Mixpanel and New Relic.

57. The tracking Codes described above each operate in the same manner for all putative Class Members.

58. Like Plaintiff, each Class Member visited Defendants' Website with the Code embedded in it, and the Code intercepted the Class Members' Website Communications with the Website by sending hyper-frequent logs of those communications to Mixpanel and New Relic.

59. The Code procured by Defendants is an electronic, mechanical, or other analogous device in that the Code, monitors, collects, and records the content of electronic computer-to-computer communications between Plaintiff's mobile computer and/or mobile device and the computer servers and hardware utilized by Defendants to operate their Website, subsequently interpreting that data to repurpose it for profits.

60. Alternatively, even if the Code itself were not a device, the Code is a software designed to alter the operation of a Website visitor's computer or mobile phone by instructing the hardware components of that physical device to run the processes that ultimately intercept the visitor's communications and transmit them to Mixpanel and New Relic.

61. The data collected by the Code identified specific information input and content viewed, and thus revealed personal and sensitive information about website visitors' internet activity and habits. As such, by the very nature of its operation, the Code is a device used to intercept electronic communications.

62. The Website Communications that Defendants solicited the Code Vendors to monitor, collect, and record was content generated through Plaintiff's and Class Members' use, interaction, and communication with Defendants' Website relating to the substance and/or meaning of Plaintiff's and Class Members' communications with the Website, *i.e.*, information inputted by Plaintiff and Class Members, and pages and content clicked on and viewed by Plaintiff and Class Members. This information is "content" and is not merely record information regarding the characteristics of the message that is generated in the course of the communication, nor is it simply information disclosed in the referrer headers. The mere fact that Defendants value this content, and procures third parties to monitor, intercept and record it, confirms these communications are content that convey substance and meaning to Defendants, and, in turn, to Mixpanel and New Relic who receive the intercepted information.

63. Plaintiff reasonably expected that her visit to Defendants' Website would be private and that Defendants would not have procured multiple third-party vendors to track, record, and/or watch Plaintiff as she browsed, interacted with the Website, and searched for products or services.

**E. Plaintiff and Class Members Did Not Consent to the Interception of their Electronic Communications**

64. Plaintiff and Class Members did not provide prior consent to Defendants' interception of their Website Communications, nor could they, as the interception begins immediately upon arriving at Defendants' Website.

65. Even worse, when Defendants asked Plaintiff and Class Members for consent, Defendants had no intention of disallowing the Code from running when Website visitors chose to reject functional and/or marketing cookies.

66. When Plaintiff and Class Members chose to reject functional and/or marketing cookies, Defendants still allowed the Code Vendors to deploy the Code and capture Website Communications.

## V. CLASS ACTION ALLEGATIONS

67. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated.

68. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All Pennsylvania citizens who visited www.jewelersmutual.com and rejected cookies while the Code embedded in www.jewelersmutual.com.

69. Excluded from the Class are Defendants' officers and directors, and any entity in which any Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

70. Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23.

71. **Numerosity, Rule 23(a)(1)**: The members of the Class are so numerous that individual joinder of all Class Members is impracticable. The precise number of Class Members and their identities may be obtained from the books and records of Defendants and/or the Code Vendors.

17

72. **Commonality, Rule 23(a)(2)**: This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

    a)    whether Defendants procure the Code Vendors and other third parties to intercept Defendants' Website visitors' Website Communications;

    b)    whether Defendants intentionally disclose the intercepted Website Communications of their Website users;

    c)    whether Defendants acquire the contents of Website users' Website Communications without their consent;

    d)    whether Defendants' conduct violates Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. § 5701, *et seq.*;

    e)    whether Plaintiff and Class Members are entitled to equitable relief; and

    f)    whether Plaintiff and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

73. **Typicality, Rule 23(a)(3)**: Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

74. **Adequacy of Representation, Rule 23(a)(4)**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigation to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and

Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Class.

75. **Predominance, Rule 23(b)(3)**. Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendants intercepted Plaintiff's and Class Members' Website Communications, then Plaintiff and each Class Member suffered damages by that conduct.

76. **Superiority, Rule 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Class members have little interest in individually controlling a separate action, because most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy absent a class action. To Plaintiff's knowledge, there is no other pending case where Defendants' customers seek to represent a class of individuals impacted based on the conduct alleged in this Complaint. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties,

19

conserves judicial resources and the parties' resources, and protects the rights of each Class member.

77. Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

78. Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through the books and records of Defendants and/or the Code Vendors.

## VI. CAUSES OF ACTION

### COUNT I
### Violation of Pennsylvania Wiretap Act
### 18 Pa. Cons. Stat. § 5701, et seq.

79. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

80. Plaintiff brings this claim individually and on behalf of the Class.

81. The Pennsylvania Wiretap Act (the "Act") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

82. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the

20

rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

83. "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

84. "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

85. "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

86. "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

87. Defendants are "person" for purposes of the Act because they are corporations.

88. The Code procured by Defendants is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the Act.

89. Plaintiff's and Class Members' intercepted Website Communications constitute the "contents" of electronic communication[s]" within the meaning of the Act.

90. Defendants intentionally procure and embed the Code on their Website to spy on, automatically and secretly, and intercepts their Website visitors' electronic interactions communications with Defendants in real time.

91. Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.

92. Plaintiff and Class Members did not consent to having their Website Communications wiretapped.

93. Pursuant to 18 Pa. Cons. Stat. 5725(a), Plaintiff and the Class Members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

94. Defendants' conduct is ongoing, and they continue to unlawfully intercept the communications of Plaintiff and Class Members any time they visit Defendants' Website with the Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
### Invasion of Privacy – Intrusion Upon Seclusion

95. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

96. Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

97. Plaintiff brings this claim individually and on behalf of the Class.

98. Plaintiff and Class Members have an objective, reasonable expectation of privacy in their Website Communications.

99. Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendants could collect or disclose their Website Communications.

100. Plaintiff and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their

22

personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

101. Defendants intentionally intrude on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent.

102. Defendants' conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

103. Plaintiff and Class Members were harmed by Defendants' wrongful conduct as Defendants' conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

104. Defendants' conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality have caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

105. Additionally, given the monetary value of individual personal information, Defendants deprived Plaintiff and Class Members of the economic value of their interactions with Defendants' Website, without providing proper consideration for Plaintiff's and Class Members' property.

106. Further, Defendants have improperly profited from their invasion of Plaintiff's and Class Members' privacy in their use of their data for their economic value.

107. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

108. Defendants' conduct is ongoing, and they continue to unlawfully intercept the communications of Plaintiff and Class Members any time they visit Defendants' Website with the Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and Class Members' favor and against Defendants as follows:

A. Certifying the Class and appointing Plaintiff as the representative of the Class;

B. Appointing Plaintiff's counsel as class counsel;

C. Declaring that Defendants' past conduct was unlawful, as alleged herein;

D. Declaring Defendants' ongoing conduct is unlawful, as alleged herein;

E. Enjoining Defendants from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages in an amount in excess of the arbitration limits, as well as restitution and/or disgorgement of profits unlawfully obtained;

G. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest;

H. Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses; and

I. Granting such other relief as the Court deems just and proper.

24

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, demand a trial by jury of any and all issues in this action so triable of right.

Dated: April 8, 2026

Respectfully submitted,

*/s/ Nicholas A. Colella*
Nicholas A. Colella
(PA 332699)
Christopher Cornelius
(Admission application forthcoming)
**LYNCH CARPENTER LLP**
1133 Penn Ave., 5th Floor
Pittsburgh PA, 15222
T: 412.322.9243
nickc@lcllp.com
chris@lcllp.com

*Attorney for Plaintiff and the Proposed Class*

25